IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, ET AL. | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | NO. 3-08-CV-0388-M-BD |
| MICHAEL KENT PLAMBECK, D.C., ET AL. | § § § | |
| Defendants. | § § | |

**FINDINGS AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

In this civil action brought by Allstate Insurance Company and three of its affiliates ("Allstate") to recover more than $10 million in damages as a result of allegedly fraudulent billings for chiropractic services, the court must decide whether plaintiffs are entitled to summary judgment as to the counterclaims asserted by various defendants. For the reasons stated herein, summary judgment should be granted in favor of plaintiffs as to all counterclaims.

I.

On March 6, 2008, plaintiffs filed the instant lawsuit against a group of defendants consisting of licensed chiropractors, chiropractic clinics, office staff, outside telemarketers, and marketing firms in five states. In their original complaint, plaintiffs describe a scheme orchestrated by Michael Kent Plambeck, a chiropractor in Arlington, Texas, through his company, Chiropractic Strategies Group, Inc., whereby auto accident victims are solicited to visit specific chiropractic clinics for a free evaluation. (*See* Plf. Compl. at 46, ¶¶ 213-21). Regardless of their actual condition, the

-1-

chiropractors and staff at these clinics allegedly advise the accident victims that they have serious injuries requiring immediate treatment. (*Id.* at 48-49, ¶¶ 229-31). According to plaintiffs, the accident victims who consent to treatment are subjected to a set protocol that is neither necessary nor reasonable, but instead designed to maximize insurance billings. (*Id.* at 49-50, ¶¶ 234-35, 237). At the time the accident victims consent to treatment, the chiropractors allegedly tell their new patients that they never will be personally liable for any treatment costs. (*Id.* at 49, ¶ 232). Instead, the chiropractors agree to look only to insurance proceeds for payment. (*Id.*). Upon consenting to treatment, the patients are immediately referred to lawyers associated with the clinics who send retention letters to the insurance companies advising that they represent the patients. (*Id.* at 50-51, ¶¶ 240-43). The lawyers then file insurance claims on behalf of the patients, which include expenses for allegedly unnecessary chiropractic treatment. (*Id.* at 51, ¶¶ 245-47).

The same day this lawsuit was filed, plaintiffs issued a News Release captioned "Alleged Multi-Million Dollar Fraud Ring Target of Federal Lawsuit -- Allstate Insurance Company Uncovers Suspected Five-State Scheme," which reads, in pertinent part:

> An Arlington, Texas based chiropractic company and its owner lead a list of 66 defendants in a federal fraud lawsuit filed Thursday in Dallas. The suit alleges deception and coercion were used against people involved in automobile accidents at clinics in Texas, Ohio, Indiana, and Alabama.
>
> Allstate Insurance Company filed the suit in the U.S. District Court for the Northern District of Texas against Chiropractic Strategies Group, Inc., its owner Michael Kent Plambeck, related law office management companies, attorneys, telemarketers, and others involved in the alleged fraud scheme. Allstate seeks in excess of $10 million.
>
> The lawsuit was filed following an extensive investigation by Allstate's Special Investigative Unit, and seeks reimbursement for the sums Allstate has paid in regard to allegedly fraudulent claims. The

lawsuit allegations include violations of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), for which Allstate seeks treble damages and recovery of its attorney's fees and court costs, in excess of $10 million.

"Insurance fraud is a billion dollar business that costs the average consumer $300 in higher insurance premiums every year," said Edward Moran, Allstate assistant vice president in charge of the company's Special Investigation Unit.   "Allstate is aggressively pursuing the fight against insurance fraud to protect consumers and help keep insurance costs down."

According to the 67 page complaint, the organization solicits persons who have been involved in motor vehicle accidents through telemarketing, which includes calls from a telemarketing entity the organization operates in Kenner, Louisiana.   The telemarketers promise the prospective patients a free examination, and at times falsely represent that they are representatives of "Allstate" or an "insurance company."

Coerced and Deceived

The Court filing alleges that, once at the clinic, the solicited individuals are often coerced and deceived into treatment through a process the organization calls "conversion."  Potential patients are allegedly told they have sustained substantial injuries and require an immediate course of treatment. The complaint further alleges patients are then put through a standardized and unnecessary treatment plan. Once a solicited individual is "converted" into a patient, they are referred to a personal injury law office associated with the organization.  The Complaint alleges persons working at these law offices often come directly to the clinics to "sign up" patients as clients.

(Plf. MSJ App., Exh. A at 1-2).  The News Release identifies 19 individuals and four business

entities as defendants in the federal lawsuit.  (*Id.* at 2).  It also names various cities in Texas, Ohio,

Indiana, and Alabama as past and present locations for the accused chiropractic clinics.  (*Id.*).  The

News Release concludes with a "Call to Action," encouraging "[p]ersons who have knowledge of,

or have been victimized by, the scheme alleged in the complaint" to contact the National Insurance

Crime Bureau ("NICB"). (*Id.*). More than 30 different media outlets republished all or parts of the News Release. (*See id.*, Exh. A at 4-54). Allstate representatives subsequently provided additional information to some of the media outlets regarding the federal lawsuit and the allegedly fraudulent activities of defendants. (*See, e.g. id.*, Exh. A at 4-6, 9-10, 15-16).

Upset with the content of the News Release and other statements attributed to plaintiffs, 25 chiropractic clinics and five individuals named as defendants in this lawsuit brought counterclaims for defamation, tortious interference, and fraud.[1] Succinctly stated, the counterclaimants allege that the News Release and statements made by Allstate representatives in press interviews constitute non-privileged, defamatory statements that caused economic damage to the clinic entities and mental anguish to the individual defendants. (*See* Def. 1st Am. Countercl. at 12-13, ¶¶ 18-19). The counterclaimants further allege that some patients have refused to do business with one or more of the clinic entities because of the News Release and interviews given by Allstate representatives, thereby constituting tortious interference with existing contracts and prospective business relationships. (*See id.* at 13, ¶ 19 & 16-17, ¶ 23). Finally, the counterclaimants contend that plaintiffs fraudulently reduced payments to the clinic entities by falsely representing that their "take-it-or-leave-it" offers to pay more than 300 insurance claims were based on the market value of chiropractic services rendered to patients when, in reality, the offers were based on arbitrary

---

[1] The 25 chiropractic clinics are N. Carrier Chiropractic Clinic, Inc., Buckner 30 Chiropractic Clinic, Inc., Hampton Chiropractic Clinic, Inc., Haltom City Chiropractic Clinic, Inc., Brownsville Chiropractic & Wellness Center, Inc., 11th Street Chiropractic Clinic, LLC, Dove Point Chiropractic Clinic, Inc., Brownsville Chiropractic Clinic, Inc., El Paso Chiropractic Clinic, LLC, WTC Chiropractic Clinic, LLC, Harlingen Chiropractic Clinic, Inc., Wolfin Chiropractic Clinic, LLC, Mainland Chiropractic Clinic, LLC, Bergstrom Chiropractic Clinic, Inc., Laredo Chiropractic Clinic, LLC, SA Chiropractic Clinic, LLC, Congressional Chiropractic Health Center, Inc., Vernon Place Chiropractic Health Center, Inc., Arlington Chiropractic, Inc., Youngstown Chiropractic, Inc., East Broad Chiropractic, Inc., American Chiropractic, Inc., West Broad Chiropractic, Inc., Shaker Square Chiropractic, Inc., and West Tusc Chiropractic, LLC -- all of which are owned, in whole or in part, by Michael Kent Plambeck. (*See* Def. MSJ Resp. App., Exh. X at 681, ¶ 3). In addition to Plambeck, the individual counterclaimants are Michael Capobianco, Paul Grindstaff, Douglas Friedman, and Jennifer Giessner.

parameters intended to reduce insurance payments for such services. (*See id.* at 18, ¶ 27). Plaintiffs now seek summary judgment as to all of these counterclaims. The issues have been briefed by the parties, and the motion is ripe for determination.

II.

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment who does not have the burden of proof at trial need only identify those portions of the record that demonstrate the absence of a genuine fact issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998). Once the movant carries its initial burden, the non-movant must show that summary judgment is inappropriate "by designating specific facts beyond the pleadings that prove the existence of a genuine dispute of material fact." *Morris v. Cessna Aircraft Co.*, No. 3-05-CV-0015-M, 2011 WL 6029876 at *2 (N.D. Tex. Dec. 1, 2011) (citing cases). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *See Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 113 S.Ct. 82 (1992). All evidence must be viewed in the light most favorable to the party opposing the motion. *See Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

A.

The court initially observes that defendants have abandoned their counterclaim for tortious interference with existing contracts and prospective business relationships. Not only have defendants not adduced any evidence raising a genuine issue of material fact for trial, but they wholly fail to address this counterclaim in their summary judgment response. Consequently, the tortious

-5-

interference counterclaim should be dismissed. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n. 1 (5th Cir. 2006) (claim deemed abandoned when party failed to pursue it beyond initial pleading).

The clinic entities also expressly abandon any defamation claim arising out of the News Release and statements made by Allstate representatives in interviews with media outlets. (*See* Def. MSJ Resp. Br. at 3). Instead, the clinics argue for the first time in their summary judgment response that their defamation counterclaim is based on "historical" statements made by plaintiffs to lawyers, NICB investigators, adjusters, and other Allstate employees that the clinics were engaged in fraud. (*See id.* at 7-9). However, this new theory of recovery is not properly before the court. *See United States v. Deloitte Consulting LLP*, 512 F.Supp.2d 920, 956 (S.D. Tex. 2007), *aff'd*, No. 07-20414, 2008 WL 3244000 (5th Cir. Aug. 7, 2008) (party may not rely on new theory, raised only in response to motion for summary judgment, to defeat the motion); *Becker v. Nat'l Educ. Training Grp.*, No. 3-01-CV-1187-M, 2002 WL 31255021 at *6 (N.D. Tex. Oct. 7, 2002) (same). In their amended counterclaim, the clinic entities allege that they were defamed by statements made by plaintiffs in the News Release and in interviews with media outlets. (*See* Def. 1st Am. Countercl. at 12-13, ¶¶ 18-19). The scope of this defamation claim was confirmed by counsel for the clinic entities at a hearing held on January 14, 2011. When asked by the court to "tell me exactly" what statements are alleged to be defamatory, counsel responded:

> A. [BY COUNSEL]: The primary thrust of the statements is that the Plaintiffs' claims and statements that the Defendants comprise an organized crime syndicate are true or false.
>
> Q. [BY THE COURT]: Made in press releases?
>
> A. And in press interviews.

(*See* Plf. MSJ App., Exh. B at 57-58).  The clinic entities are bound by the representations of their attorney and will not be permitted to rely on an unpled theory of recovery to defeat summary judgment. *See Becker*, 2002 WL 31255021 at *6.  Thus, the only remaining counterclaims are the defamation claim asserted by the five individual defendants and the fraud claim asserted by the 25 clinic entities.  The court will address these counterclaims in turn.[2]

B.

The five individual counterclaimants -- Michael Kent Plambeck, Michael Capobianco, Paul Grindstaff, Douglas Friedman, and Jennifer Giessner -- allege that plaintiffs made defamatory statements about them in the initial News Release and in two subsequent interviews with media outlets.  More particularly, the individual counterclaimants contend that the following statements attributed to Allstate representatives are defamatory:

- In the News Release dated March 6, 2008, Edward Moran, an Allstate vice president in charge of the Special Investigation Unit, is quoted as saying, "Insurance fraud is a billion dollar business that costs the average consumer $300 in higher insurance premiums every year." (*See* Plf. MSJ App., Exh. A at 1).

- In an article written by Mark Collette for www.galvestondailynews.com, published on March 7, 2008, Allstate spokesman Joe McCormick is reported as saying that the alleged fraud ring was unique because it covers more than one state and operated "under the radar" for years by keeping insurance claims under $4,000 to avoid raising suspicion. McCormick also stated that, in most cases, patients did not lose money, but were scared into receiving treatment they did not need. (*See id.*, Exh. A at 15-16).

---

[2] The parties have identified Texas, Ohio, and Louisiana law as potentially applicable to the defamation claim of the individual defendants, (*see* Plf. MSJ Br. at 4; Def. MSJ Resp. Br. at 16-17), and Texas and Ohio law as potentially applicable to the fraud claim of the clinic entities. (*See* Plf. MSJ Br. at 18; Def. MSJ Resp. Br. at 12).  Because there is no material conflict between Texas law and the laws of these other states with respect to the disputed counterclaims, the court will analyze the summary judgment motion under Texas law. *See Schneider Nat. Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002), *quoting W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary.").

- In an article written by Jeremy Roebuck for www.themonitor.com, published on March 22, 2008, Allstate spokesman Bill Mellander is quoted as saying, "This is one of the largest insurance investigations that Allstate has ever undertaken . . . The investigation is exhaustive because it has to be right." According to Mellander, "[i]ndividuals who conduct fraud generally do so because they think they are digging into the deep pockets of a big insurance company . . . But the reality is they're not. They're stealing from you and me." Roebuck further reported that "Allstate estimates Chiropractic Strategies and associated businesses are responsible fore [sic] more than $10 million in fraudulent payments over the past six years." (*Id.*, Exh. A at 4).[3]

An essential element of defamation is publication of a defamatory statement "of and concerning" the aggrieved party. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), *cert. denied*, 119 S.Ct. 1358 (1999). A publication is "of and concerning" the aggrieved party " if persons who knew and were acquainted with the [party] understood from viewing the publication that the allegedly defamatory matter referred to the [party]." *Allied Mktg. Grp., Inc. v. Paramount Pictures Corp.*, 111 S.W.3d 168, 173 (Tex. App. -- Eastland 2003, pet. denied), *citing Newspapers Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960). It is not necessary that the aggrieved party be specifically named in the publication, so long as it is clear to those who know and are acquainted with the party that the defamatory statement is directed to him or her. *Vice v. Kasprzak*, 318 S.W.3d 1, 13 (Tex. App. -- Houston [1st Dist.] 2009, pet. denied). Whether an aggrieved party is referenced in a defamatory statement is a question of law for the court. *See Newspapers*, 339 S.W.2d at 893.

Neither the Collette nor the Roebuck article mentions Capobianco, Friedman, Giessner, or Grindstaff by name. Nor is there any evidence that any person who knows or is acquainted with

---

[3]   In their summary judgment response, the individual counterclaimants also point to an article written by Janine Reyes for www.kgbt4.com, published on March 11, 2008, in which Mellander is quoted as saying, "This is very complex . . . It is an organized scheme. It is processes set up for the purpose of facilitation of fraud against insurers." (*See* Def. MSJ Resp. Br. at 19 & Def. MSJ Resp. App., Exh. A at 9). However, this allegedly defamatory statement was not pled in the amended counterclaim or identified in any prior pleadings. Thus, the individual counterclaimants cannot rely on this statement to avoid summary judgment on their defamation claim. *See Becker*, 2002 WL 31255021 at *6.

Capobianco understood that the allegedly defamatory statements in those articles referred to him. Although there is some evidence that people acquainted with Friedman, Giessner, and Grindstaff understood that the statements in the Collette and Roebuck articles referred to them, that evidence is wholly conclusory and does not raise a genuine issue of material fact for trial. In a sworn affidavit, Lance Arnold states that he has known Friedman for more than 30 years and Giessner for more than 12 years. (*See* Def. MSJ Resp. App., Exh. V at 676, ¶ 2). Then, in a single paragraph, Arnold states:

> I read the press release and other published news articles, such as the March 6, 2008 Allstate press release, which stated, among other things, that the Defendants in the lawsuit had been committing fraud. I read these publications at or near the time that they were originally published in the Spring of 2008. Because of my relationship with Douglas Friedman and Jennifer Giessner, when I read these articles, I knew that they involved Douglas Friedman and Jennifer Giessner. This is true even though some of the articles do not specifically mention either Douglas Friedman or Jennifer Giessner by name.

(*Id.*, Exh. V at 677, ¶ 3). Another affiant, Tyce Hergert, says that he has known Grindstaff since 1995. (*Id.*, Exh. W at 678, ¶ 2). Using language almost identical to that used by Arnold in his affidavit, Hergert goes on to state:

> I read Allstate press releases and other published news articles which stated, among other things, that the Defendants in the lawsuit had been committing fraud. I read these publications at or near the time that they were originally published in the Spring of 2008. Because of my relationship with Paul Grindstaff, when I read these articles, I knew that they involved Paul Grindstaff. This is true even though some of the articles do not specifically mention Paul Grindstaff by name.

(*Id.*, Exh. W at 678-69, ¶ 3). Significantly, neither Arnold nor Hergert say that they read the Collette or Roebuck articles. Nor do these affiants explain *how* they knew that the articles involved Friedman, Giessner, or Grindstaff. Their conclusory assertions are simply insufficient to raise a fact

issue as whether the Collette or Roebuck articles "concern" those counterclaimants. *See Topalian*, 954 F.2d at 1131 (conclusory statements are not competent summary judgment evidence).

Moreover, "[c]ommunications and publications made in the due course of a judicial proceeding will not serve as the basis of a defamation action." *Dallas Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 238 (Tex.App.--Dallas 2000, pet. denied), *cert. denied*, 122 S.Ct. 342 (2001), *citing Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942). This immunity is absolute even if the statement is false and uttered or published with express malice. *Id.* The privilege extends to statements made by parties, their attorneys, and witnesses, and attaches to all aspects of the legal proceeding. *See James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982); *Helfand v. Coane*, 12 S.W.3d 152, 157 (Tex. App. -- Houston [1st Dist.] 2000, pet. denied). Even out-of-court statements are privileged if the statements bear some relationship to pending or contemplated litigation. *See Bennett v. Computer Assocs. Intern., Inc.*, 932 S.W.2d 197, 201 (Tex. App. -- Amarillo 1996, writ denied); *Russell v. Clark*, 620 S.W.2d 865, 869 (Tex. App. -- Dallas 1981, writ ref'd n.r.e.). Whether an out-of-court statement is related to a proposed or existing judicial proceeding is a question of law. *See Russell*, 620 S.W.2d at 870. When deciding the issue, "the court must consider the entire communication in its context, and must extend the privilege to any statement that bears some relation to an existing or proposed judicial proceeding." *Id.* All doubt should be resolved in favor of the communication's relation to the proceeding. *Id.*; *5-State Helicopters, Inc. v. Cox*, 146 S.W.3d 254, 257 (Tex. App. -- Fort Worth 2004, pet. denied).

The court has little difficulty concluding that all statements in the News Release are privileged. The News Release advises the media that a federal lawsuit has been filed against Plambeck and associated chiropractors, attorneys, law office management companies, telemarketers,

and "others involved in the alleged fraud scheme." (*See* Plf. MSJ App., Exh. A at 1-2). Almost every paragraph of the News Release refers to the lawsuit or summarizes the allegations made by plaintiffs in their complaint. (*See id.*). Thus, the News Release is privileged and cannot form the basis of a defamation action. *See Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24, 28 (Tex. App. -- Houston [1st Dist.] 2004, pet. denied) (press release advising the media that a lawsuit has been filed, including a basic description of the allegations, entitled to absolute privilege); *Finlan*, 27 S.W.3d at 238 (same). The only paragraph that does not mention the lawsuit or the complaint states that "[i]nsurance fraud is a billion dollar business that costs the average consumer $300 in higher insurance premiums every year." (*See* Plf. MSJ App., Exh. A at 2). Taken in the context of the rest of the News Release, that statement clearly bears some relation to the lawsuit, which alleges an elaborate scheme to defraud insurance companies.

The only remaining statements that could possibly form the basis of a defamation claim are those appearing in the Collette and Roebuck articles regarding Plambeck. Resolving all doubts in favor of finding that the statements pertain to the instant judicial proceeding, the court determines that the statements regarding Plambeck bear some relation to the lawsuit and are privileged. First, both challenged statements appear in the context of articles reporting the filing of this lawsuit and the allegations made by plaintiffs in their complaint. The statement attributed to Allstate spokesman Joe McCormick in the Collette article -- that patients were scared into receiving treatment they did not need -- is an accurate characterization of the allegation that "[m]isrepresentations and scare tactics are [  ] employed to 'retain' or keep the new patients in the treatment program." (*See* Plf. Compl. at 49, ¶ 235). Similarly, the statement attributed to Allstate spokesman Bill Mellander in the Roebuck article -- that the defendants are "stealing from you and me" -- relates to allegations

-11-

in the complaint that defendants fraudulently billed Allstate for unreasonable and unnecessary chiropractic services. (*See, e.g. id.* at 54, ¶ 249). Accordingly, plaintiffs are entitled to summary judgment on the defamation counterclaim.

C.

That leaves the fraud claim of the clinic entities. As best the court understands this counterclaim, the clinics contend that plaintiffs falsely represented that their offers to pay 334 Personal Injury Protection ("PIP") claims were based on the market value of chiropractic services rendered to patients when, in fact, the offers were arbitrary amounts intended to reduce insurance payments for such services. The details of this alleged fraud are described by Plambeck in his affidavit. (*See* Def. MSJ Resp. App., Exh. X at 682-84, ¶¶ 4-10). When the clinic entities submitted their charges for chiropractic services, they received Explanation of Benefits ("EOB") explaining the action taken by Allstate with respect to each charge submitted for payment. (*Id.*, Exh. X at 682, ¶ 4). While some charges were accepted and paid, others were reduced or refused in their entirety. (*Id.*, Exh. X at 682, ¶ 5). Among the reasons given by plaintiffs for reducing or rejecting a claim were that the "[c]harge exceeds the reasonable amount for this procedure in the region where the service was provided[,]" or "[t]he treatment has exceeded the typical frequency of care for the listed diagnosis." (*Id.*; *see also id.*, Exh. X at 688). Plambeck, who was primarily responsible for adjusting and compromising billings for the clinic entities, allegedly accepted reduced payments for services rendered to patients based on plaintiffs' representation that the charges were unreasonable or that the treatment was unnecessary. (*Id.*, Exh. X at 682-84, ¶¶ 4, 6-7). The clinic entities now contend that the EOB explanations were false -- that is, payments were reduced as a result of a policy to avoid

-12-

paying claims for chiropractic services, not because the charges were unreasonable or the treatment was unnecessary. (*See* Def. MSJ Resp. Br. at 13).

The court notes that the summary judgment record does not contain EOBs -- or any other evidence of alleged misrepresentations by plaintiffs -- for 249 of the 334 PIP claims at issue. (*See* Def. MSJ Resp. Br. at 14 & Def. MSJ Resp. App., Exh. X at 684, ¶ 10 & 688-873). Without such evidence, the clinic entities cannot prove an essential element of their fraud claim.[4] As to the 85 PIP claims which are supported by EOBs, the clinic entities have failed to raise a genuine issue of material fact as to whether the explanations or representations contained therein are false. Specifically, there is no evidence to controvert the explanation provided by plaintiffs for reducing or refusing to pay the claims -- that charges exceeded the reasonable amount for the procedure in the region where the service was provided and that the treatment exceeded the typical frequency of care for the listed diagnosis. The only evidence adduced by the clinic entities on this point is testimony by attorneys and former Allstate employees that plaintiffs *generally* adjusted claims based on arbitrary parameters. (*See* Def. MSJ Resp. App., Exh. F at 175-76, Exh. H at 245-46, Exh. K at 286-93, Exh. Y at 874-76 & Exh. Z at 877-79). However, none of this testimony *specifically* pertains to any of the PIP claims at issue. Plaintiffs are therefore entitled to summary judgment on the fraud counterclaim.

---

[4] The court is unable to infer from the EOBs in the record that the missing EOBs contain similar representations. The elements of fraud are never presumed. Rather, each element must be proved by competent evidence. *See Continental Transfer & Storage Co. v. Midcity Realty Co.*, 348 S.W.2d 56, 59 (Tex. Civ. App. -- Dallas 1961, writ refused n.r.e.). Nor are the clinic entities entitled to conduct discovery on this issue. Throughout this proceeding, defense counsel repeatedly represented that no discovery was needed on any of the counterclaims. *See* Order, 5/18/11 at 1-2, *citing* Supp. Jt. Stat. Rep., 12/30/10 at 12, ¶¶ 11-12 & Hrg. Tr., 1/14/11 at 11.

## RECOMMENDATION

Plaintiffs' motion for summary judgment [Doc. #465] should be granted in its entirety. The counterclaims for defamation, tortious interference, and fraud should be dismissed with prejudice.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: January 4, 2012.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE