# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

November 03, 2015

Ms. Karen S. Mitchell
Northern District of Texas, Dallas
United States District Court
1100 Commerce Street
Earle Cabell Federal Building
Room 1452
Dallas, TX 75242

    No. 14-10574   Allstate Insurance Company, et al v. Michael
                             Plambeck, et al
                             USDC No. 3:08-CV-388

Dear Ms. Mitchell,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

Enclosed for the district court and counsel is the approved bill of costs.

                                       Sincerely,

                                       LYLE W. CAYCE, Clerk

                                       By: _____
                                       Melissa V. Mattingly, Deputy Clerk
                                       504-310-7719

cc:
    Mr. Wade Crosnoe
    Mr. Peter Michael Jung
    Mr. David Kassabian
    Mr. Kenneth Richard Stein
    Mr. Bret Wayne Weatherford

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

No. 14-10574

United States Court of Appeals
Fifth Circuit

**FILED**
September 17, 2015

Lyle W. Cayce
Clerk

ALLSTATE INSURANCE COMPANY;
ALLSTATE INDEMNITY COMPANY;
ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY;
ALLSTATE COUNTY MUTUAL INSURANCE COMPANY,

                Plaintiffs–Appellees
                Cross–Appellants,

versus

MICHAEL KENT PLAMBECK, DC; MICHAEL CAPOBIANCO, DC;
PAUL GRINDSTAFF, DC; DOUGLAS FRIEDMAN;
JENNIFER GIESSNER,
Formerly Known as Jennifer Makarwich, Formerly Known as Jennifer Bland;
ET AL.,

                Defendants–Appellants
                Cross–Appellees.

Appeals from the United States District Court
for the Northern District of Texas

Before JONES, SMITH, and COSTA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Allstate Insurance Company ("Allstate") sued a consortium of telemarketing companies, chiropractic clinics, and affiliated law offices spanning several states, contending that they had violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"). A jury returned a verdict in Allstate's

favor, leading to a sizable award and attorney's fees. The defendants contend that the evidence was insufficient under RICO, that some claims were barred by the statute of limitations, and that the district court erred in admitting Allstate's expert witnesses. Allstate challenges the district court's decision not to award prejudgment interest and to reduce the fee award. We affirm.

I.

The scheme to defraud insurance companies such as Allstate aimed to identify persons who had been in vehicle accidents but were not at fault. The defendants would convince them to receive unnecessary chiropractic services, then would file third-party claims against the at-fault party's insurer.

First, the participants had to identify potential claimants. Michael Plambeck owned Media Placement Services ("MPS"), a telemarketing firm, which Douglas Friedman managed. Defendant Jennifer Giessner was Plambeck's Controller. MPS employees purchased police accident reports and scoured them for not-at-fault victims who met certain criteria, usually low-income individuals without health insurance.

Once a potential patient was identified, an MPS employee would call to warn that the person may have suffered trauma whose ill effects might not be apparent for weeks. The telemarketer would offer the victim a free spinal exam to determine whether he was injured. The caller would assure the prospective patient that the appointment would be at no cost to him or his insurer, but the charges would be billed to the at-fault party. The caller would schedule an appointment at a clinic that was part of Chiropractic Strategies Group ("CSG"), which Plambeck owned; defendants Michael Capobianco and Paul Grindstaff were Clinic Partners. At a clinic, the patient would sign several forms, including an Assignment of Benefits that allowed the clinic to collect directly from the insurer.

A Plambeck-trained chiropractor would administer the free examination, at the end of which the chiropractor often ordered x-rays. The x-rays often were marked up with lines and circles purporting to show that the patient needed treatment, although the markings had little or no diagnostic value. Many of the x-rays were of poor quality, with some rendered unreadable by underexposure or overexposure and others made difficult to parse by the presence of buttons, clips, zippers, and belt buckles. Even though the chiropractor deemed x-rays necessary, the useless ones were not retaken, but the insurer was still billed for them.

The chiropractors almost always prescribed the same treatment: hot and cold packs, electrical stimulation, massages, and other passive modalities. Patients received the treatment for the same length of time—daily for two weeks, then three times a week. After sixteen or twenty visits, the chiropractor often deemed the patient cured without a reexamination or follow-up testing.

When a patient came to a clinic, he was usually referred, at Plambeck's direction, to a law firm with substantial ties to Plambeck. Many of those firms were funded and run by two companies, Professional Management Group LLC ("PMG") and Law Office Network LLC ("LON"), which were owned by Randall Toca and funded by Plambeck. PMG was in the same Plambeck-owned building with MPS and CSG, and Plambeck exercised significant oversight over PMG employees. The patient would meet with a lawyer, but nonlawyer employees drafted demand letters on firm letterhead, mailed them to insurers, and negotiated settlements.

Settlement checks were sent to local offices, then forwarded to headquarters. The case managers prepared deposits to the representative firms' trust accounts, from which Toca disbursed the funds to various entities. Often the accident victim received less than one-third of the funds.

3

## II.

After beginning a two-year investigation in 2005, Allstate sued Plambeck and more than sixty other individuals and entities, alleging violations of federal and state RICO statutes, fraud, conspiracy to commit fraud, and unjust enrichment. Allstate sought to recover the amount it customarily allowed for services Plambeck's clinics had provided to 721 patients. During trial, Allstate dropped a number of cases, and the district court dismissed others, ultimately reducing the contested insurance claims to 555.

After a five-week trial and four days of deliberations, the jury found that the defendants had violated the federal RICO statute and Ohio's RICO statute, had committed fraud, and were unjustly enriched in 391 of the 555 cases. Almost all of the 391 cases involved missing or deficient x-rays.

Although the jury found liability on multiple theories, it awarded damages only for the federal and Ohio RICO violations and not for fraud or unjust enrichment. Actual damages assessed on the appealing defendants were $945,593, and the court assessed treble damages of $2,836,779.[1] The court denied Allstate's request for prejudgment interest on the actual-damages amount and denied defendants' motion for a new trial.

Allstate moved for attorney's fees of $1,903,006.75. The court held that the hourly rate and total hours were appropriate, but it reduced the award because Allstate had prevailed on only 391 of the original 721 disputed claims. Because Allstate proved only about 54% of its underlying claims, the court awarded only 54% of the requested fees, or $1,027,623.65.

---

[1] The jury also awarded damages for the Ohio RICO claims, which the court trebled, but the court ordered that the defendants would not recover doubly on the federal and Ohio RICO claims.

4

Case: 14-10574   Document: 00513256909   Page: 5   Date Filed: 11/03/2015
Case 3:08-cv-00388-M Document 768 Filed 11/03/15 Page 6 of 19 PageID 48308

No. 14-10574

III.

Both sides appeal. The defendants challenge the sufficiency of the evidence supporting the existence of a RICO enterprise, causation, and damages; additionally, they assert that some claims are barred by limitations and that the court erred in admitting certain of Allstate's experts. Both the Ohio RICO claims and the attorney's-fee award are contested, but those challenges rise and fall on the success of the federal RICO claims.

Allstate's cross-appeal asserts that the district court abused its discretion in not awarding prejudgment interest and in reducing the total attorney's-fee request. Allstate presses a contingent cross-appeal: If we grant relief to the defendants, Allstate disputes the district court's dismissing its misrepresentation claims and excluding certain evidence and questions from the jury charge and verdict form.

IV.

We review *de novo* a denial of a motion for judgment as a matter of law. *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 405 (5th Cir. 2007). We reverse a denial only if there is "no legally sufficient evidentiary basis for a reasonable jury to find for a party." *Id.* "[W]e view all evidence and draw all reasonable inferences in the light most favorable to the verdict" and reverse only when the evidence and inferences "point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." *Id.*

RICO makes it unlawful for "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The defendants' first challenge is to the existence of an enterprise. RICO defines an enterprise as "any individual,

5

Case: 14-10574  Document: 00513256909  Page: 6  Date Filed: 11/03/2015
Case 3:08-cv-00388-M Document 768 Filed 11/03/15 Page 7 of 19 PageID 48309

No. 14-10574

partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4). At trial, Allstate contended that the various defendants fell into the last category—that they were an enterprise "associated in fact."

An association-in-fact enterprise "(1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1461 (5th Cir. 1991). RICO does not require than an enterprise be a separate business-like entity. *Boyle v. United States*, 556 U.S. 938, 945 (2009). Instead, an association-in-fact enterprise includes "a group of persons associated together for a common purpose of engaging in a course of conduct," and that enterprise can be proved with "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 944–45. A pattern of racketeering activity does not, by itself, necessarily show that an enterprise exists. *See United States v. Turkette*, 452 U.S. 576, 583 (1981). But the evidence establishing the enterprise and the pattern of racketeering may "coalesce." *Boyle*, 556 U.S. at 947.

The linchpin of enterprise status is the continuity or ongoing nature of the association. *Calcesieu Marine Nat'l Bank*, 943 F.2d at 1462. "The enterprise must have continuity of its structure and personnel, which links the defendants, and a common or shared purpose." *Id.* The Supreme Court has similarly identified those three structural features as indispensable to an association-in-fact enterprise: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

6

The defendants contend that the shared-purpose requirement was not satisfied because the only shared purpose was to carry out the pattern of racketeering; no associated-in-fact enterprise exists if the shared purpose was merely to conduct the racketeering, they assert. They failed to raise that challenge, however, until their Federal Rule of Civil Procedure 50(b) motion after the verdict. Consequently, our review on that point is for plain error. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001). "If any evidence exists that supports the verdict, it will be upheld." *Id.*

The defendants point to no binding authority that an enterprise must have a purpose besides committing racketeering activity. Instead, they assert that there must be a different purpose because a RICO enterprise cannot be the pattern of racketeering itself. But in *Turkette*, 452 U.S. at 583, the Court rejected a similar challenge that would have excluded from "enterprise" those entities pursuing solely unlawful ends. *Id.*

Even with "wholly illegitimate enterprises such as an illegal gambling business or a loan-sharking operation" the government must still satisfy different legal standards to show the existence of the enterprise and the pattern of racketeering. *Id.* at 583–85. Although the evidence proving the two will sometimes coalesce, the government still has to satisfy the organizational metric of the enterprise (including continuity and common purpose) and the statutorily enumerated predicate offenses. *Id.* at 583. There is thus no impermissible collapsing of the distinction between the enterprise and the pattern of racketeering. The Sixth Circuit examined *Boyle* and held that an association can satisfy the enterprise requirement under RICO even if its sole purpose is to carry out a pattern of racketeering. *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 794–95 (6th Cir. 2012). If the district court committed an error, it certainly was not plain.

In another challenge to the common-purpose requirement, the defendants contend the evidence was insufficient to show that Toca and Friedman shared the fraudulent purpose of the enterprise. The defendants assert that, because those two were involved with only some of the claimants, Allstate failed to show that they shared that purpose.

Establishing that Toca and Friedman had limited involvement does not seriously cast doubt on the conclusion that they shared in the enterprise's purpose. The jury was presented with sufficient evidence to conclude that they were actively involved and shared the goal of making money through the scheme. PMG, MPS, and CSG shared a building and regularly saw staff switch between entities. Plambeck loaned money to Toca for the law offices, directed PMG's employees regarding settlements, and divided the proceeds. The jury had plenty of evidence to find that Toca was a willing participant in the scheme. The same is true for Friedman, who ran the solicitation side of the enterprise, following Plambeck's directions and signing up patients.

By highlighting Toca's and Friedman's limited roles, the defendants may be contesting that they "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the] enterprise's affairs." 18 U.S.C. § 1962(c). Even if Toca and Friedman were not the main leaders, however, they qualify because they "participate[d] in the operation or management of [the] enterprise." *Reves v. Ernst & Young*, 507 U.S. 170, 84 (1993). "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* It is evident that Toca and Friedman participated in managing the enterprise with their supervisory roles in their respective parts of the scheme, even if Plambeck was in charge.

Finally, focusing on the question whether the defendants engaged in a pattern of racketeering, they assert that they lacked the requisite intent to

8

defraud. Because the jury found liability only on those insurance claims involving bad x-rays, the defendants state that Allstate needed to show some nexus between the x-rays and Plambeck, Toca, and Friedman. If the defendants did not take, review, or know about the bad x-rays, how could they have the requisite intent?

That contention has two flaws. First, although there is no evidence that Friedman, Toca, and Plambeck took any of the deficient or missing x-rays, circumstantial evidence links them to the x-rays. And irrespective of how closely tied the three were to the direct handling of the x-rays, they were involved, in any event, with the supervision of the clinic and used its inadequate work to support the false claims for medical services. For example, Plambeck personally trained new chiropractors at CSG's Louisiana headquarters, teaching doctors to use x-rays as a sales tool. Toca was present at some of the training sessions. After the initial two-week session, Plambeck sent chiropractors for additional training at the Dove Pointe clinic, which took a large portion of the bad x-rays. Furthermore, Friedman wrote the telemarketing scripts used to lure patients to the clinics and instructed telemarketers to target vulnerable individuals. He was also head of marketing for CSG, which owned the clinics that took the bad x-rays.

Second, the defendants misunderstand the nature of the predicate acts. Allstate's theory at trial was that Friedman, Toca, and Plambeck had engaged in a pattern of mail and wire fraud. Both of those crimes, which constitute predicate acts under 18 U.S.C. § 1961(1), are broad. "The mail fraud statute applies to anyone who knowingly causes to be delivered by mail anything for the purpose of executing any scheme or artifice to defraud." *United States v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009) (internal citations and quotation marks omitted). Similarly, wire fraud involves the use of, or causing the use

Case: 14-10574   Document: 00513256909   Page: 10   Date Filed: 11/03/2015
Case 3:08-cv-00388-M Document 768 Filed 11/03/15   Page 11 of 19   PageID 48313

No. 14-10574

of, wire communications in furtherance of a scheme to defraud. *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009). "Once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme." *Id.*

It follows that Allstate needed to prove only that Friedman, Toca, and Plambeck had engaged in a scheme to defraud for which the use of the mail or wires was reasonably foreseeable. *See Whitfield*, 590 F.3d at 354–55. And, as we have explained at length, Allstate did that. Plambeck's entities, which Friedman and Toca ran, operated as a cohesive unit. The enterprise targeted poor and uneducated individuals, convinced them that they needed chiropractic and legal services, and solicited payment for those services from insurers like Allstate. Based on the evidence that conversations with prospective patients were highly scripted and allowed for almost no deviation, the jury could reasonably infer that the scheme was fraudulent and that using the mail or wire services was inevitable. As a result, it makes no difference that Friedman, Toca, and Plambeck did not take the x-rays.

V.

Regarding causation, RICO provides civil remedies to "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). An injured party must show that the violation was the but-for and proximate cause of the injury. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). In cases predicated on mail or wire fraud, reliance is not necessary. *Id.*

The defendants contend that this case is a repeat of *Receivable Finance*, in which we overturned a verdict on a fraud claim because Allstate had not

produced evidence showing that it had relied on the defendant's misrepresentations. That case, however, was predicated on common-law fraud, which has a reliance requirement, and not on RICO or mail fraud. *Receivable Fin.*, 501 F.3d at 406. As recognized in *Bridge*, 553 U.S. at 653, mail fraud and its place in RICO framework are different from a case alleging common-law fraud, and one of the differences is the lack of a reliance requirement. In *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009), we addressed *Bridge* and expressly overruled the requirement that a RICO plaintiff show reliance.

Furthermore, the jury instructions stated the causation requirement in terms of proximate cause, not reliance, stating that proximate cause was present if "the injury or damage was either a direct result or a reasonably probable consequence of the act." If the defendants wanted the jury to delve into issues of reliance, they should have challenged the instructions on that point.

The proper inquiry, then, is what constitutes proximate cause under RICO. The defendants contend that reliance is the only causal mechanism potentially at issue and thus should still be the proper metric. But we reject that invitation to disregard *Bridge* and *St. Germain*.

The other courts of appeals to address RICO proximate cause have similar proximate-cause definitions. The First Circuit identified directness as the prime directive of proximate cause and laid out three functional factors to help analyze whether an injury was sufficiently direct: whether there are concerns about proof resulting from the level of attenuation; avoiding multiple recoveries and the difficult apportionment calculations courts would have to make; and whether the societal interest in policing the injurious behavior justifies finding proximate causation. *In re Neurotonin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 35–40 (1st Cir. 2013). The Sixth Circuit looks to whether "the defendants' fraudulent acts were a substantial and foreseeable cause of the

Case: 14-10574      Document: 00513256909     Page: 12     Date Filed: 11/03/2015
Case 3:08-cv-00388-M Document 768 Filed 11/03/15 Page 13 of 19 PageID 48315

No. 14-10574

injuries alleged." *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 357 (6th Cir. 2008). And the Seventh Circuit similarly states that RICO proximate cause is designed for those situations "when too many unexpected things had to happen between the defendant's wrongdoing and the plaintiff's injury, in order for the injury to occur." *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 754 (7th Cir. 2011).

Regardless of how proximate cause is sliced, Allstate proved it. There is no plausible argument that the insurers were unforeseeable victims or otherwise wronged by the caprice of chance. The objective of the enterprise was to collect from the insurance companies; the entire structure of the system, from the screening for not-at-fault victims to the factory-efficient issuance of demand letters, shows that Allstate's paying up was not just incidental but was the object of the collaboration. Allstate presented sufficient evidence to satisfy the unchallenged jury instruction regarding proximate cause.[2]

## VI.

The defendants challenge the quantum of damages, claiming that Allstate failed to introduce evidence showing the payments made were solely for unnecessary chiropractic services. They posit that some of Allstate's payments could have been to cover expenses that were not the result of the defendants' fraud; some of the patients may have suffered injuries and been prescribed an appropriate treatment.

In *Receivable Finance*,[3] we faulted Allstate for failing to conduct a file-by-file determination of the damages amount and to present evidence showing

---

[2] It appears undisputed that the "but-for" causation requirement is satisfied as well.

[3] We assume *arguendo* that the same damages rule applies in this case as applied in *Receivable Finance*, which dealt with disgorgement as a remedy for state fraud claims that required proof of reliance.

Case: 14-10574      Document: 00513256909      Page: 13      Date Filed: 11/03/2015
Case 3:08-cv-00388-M Document 768 Filed 11/03/15 Page 14 of 19 PageID 48316

No. 14-10574

that all of the treatment was unnecessary or inappropriate. On the latter point, Allstate had produced evidence that *some* of the medical treatment for which it had paid was unnecessary, but without establishing that the payment covered no necessary and appropriate treatment, Allstate's damages were too speculative. *Receivable Fin.*, 501 F.3d at 414.

There is no such deficiency here. The court instructed the jury, in awarding damages, to distinguish between the portions of the bills generated for unreasonable or unnecessary services and those not generated for those services. Allstate had experts examine all of the files, not just a representative sample, and one of those witnesses testified that Allstate had internally itemized the elements of each settlement. The jury found liability on the claims for which there were deficient x-rays, and it was presented with testimony that a chiropractor could not both label an x-ray necessary and prescribe reasonable and necessary treatment in the absence of that x-ray.

The defendants had the chance to convince the jury that the insurance claims included necessary and appropriate coverage, but they did not succeed. Given our highly deferential standard of review and the evidence presented to show the inappropriateness and unreasonableness of the entire course of treatments prescribed by the chiropractors, this case does not suffer from the same flaws as did *Receivable Finance*.

### VII.

The defendants contend that the statute of limitations bars certain of Allstate's claims and that the court erred in admitting Allstate's experts. Neither argument avails the defendants.

The defendants urge that the four-year statute of limitations bars Allstate's recovery on insurance settlements paid before March 6, 2004, because

Allstate knew or should have known about those frauds. The defendants stated during trial, however, that they did not want limitations questions submitted to the jury. That decision waived the right to have the jury make a finding as to the defense. *See McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 306 (5th Cir. 1993).

The defendants challenge the admission of several expert witnesses, chiropractic experts who testified that chiropractic care was unnecessary for the patients. The defendants state that the lack of "concrete, specific reference to *any* authoritative sources" means the testimony should have been excluded. The district court, however, has broad discretion in its gatekeeping function under Federal Rule of Evidence 702, and an expert witness's testimony (and its reliability) may be based on his personal and professional experience and his own observation. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151–53 (1999). The defendants' conclusional statements regarding the impropriety of the testimony do not establish that the district court abused its wide latitude in allowing the expert witnesses to testify based on professional experience.

## VIII.

Allstate seeks an adjustment of the attorney's-fee award. The district court held that, because Allstate had shown liability on only 391 of the 721 underlying insurance claims it had originally contested, fees should be proportionate.

Allstate posits three errors. First, the court treated Allstate as having brought 721 discrete legal claims. Second, it used the proportionate approach to segregate between successful and unsuccessful claims, even though no such segregation was necessary. And third, it baselessly concluded that each of those claims should be treated as requiring equal resources.

Those challenges misconstrue what occurred. The court did not reduce the award as a means of segregating claims or attempting to determine the resources actually used in pursuit of each basis of the final judgment. Indeed, the court noted it was uncontested that Allstate's lawyers' hourly rates were reasonable, their work was necessary, and the time they spent was reasonable. Instead, the court stated that it was "exercis[ing] its discretion to reduce the fees sought by Plaintiffs commensurate with the level of success achieved by them in this case."

After calculating a reasonable rate and the proper number of hours, the court may adjust the award based on numerous factors, "including the important factor of the results obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (internal quotation marks omitted). If a plaintiff has achieved "only partial or limited success," the court may reduce the award because the fees would not reflect the scope of the relief, "even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Id.* at 435–36. The court stated that it was reducing the attorney's-fee award to account for Allstate's level of success, so we will examine its actions under that framework.

We are presented with two interrelated issues: Did the district court err in determining that the degree of Allstate's success justified reducing the award? And did the court abuse its discretion in its method of calculating the new award?

The first question is easier. We agree with the district court that Allstate realized only limited success. Although a plaintiff must obtain merely some relief to be the prevailing party, the crucial factor in determining success is the relief obtained. For example, if a plaintiff recovers only nominal damages, the proper fee usually is none at all, even though the plaintiff has won his case. *Farrar v. Hobby,* 506 U.S. 103, 115 (1992). Similarly, a plaintiff's victory in a

Case: 14-10574      Document: 00513256909      Page: 16      Date Filed: 11/03/2015
Case 3:08-cv-00388-M Document 768 Filed 11/03/15 Page 17 of 19 PageID 48319

No. 14-10574

RICO claim is a necessary condition to the award of fees, but the appropriate amount is determined in part by the plaintiff's success in obtaining the relief it pursued. Allstate prevailed on its RICO claim and the damages award was sizable, but it failed to convince the jury on many of the underlying insurance claims, and the amount of recovery was tied to the success on those claims. We therefore agree with the district court that Allstate's fees appropriately could be reduced.

The second question is more difficult. How do we measure Allstate's degree of success? The court may not use "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon." *Hensley*, 461 U.S. at 435 n.11. An award should not be reduced merely because the plaintiff prevailed on only one of several alternative grounds for the same relief. *Id.* at 435.

Allstate contends that the district court used a proscribed mathematical approach when it reduced the fee award to reflect the ratio of insurance claims on which Allstate prevailed. But the Supreme Court did not categorically bar the use of math. The court's mathematical approach was different in kind from the prohibited penalizing of alternative arguments or substitute remedies. Allstate has not identified why the proportionate approach was a poor measure of the degree of success, nor has it proposed an alternative means of calibrating the fee award to reflect its limited success. "There is no precise rule or formula for making these determinations," and "[t]he court necessarily has discretion in making this equitable judgment." *Id.* at 436–37. The use of the proportion between the number of disputed claims and the success on those claims was not an abuse of that discretion.

## IX.

The district court declined to award prejudgment interest, stating that

Case: 14-10574   Document: 00513256909   Page: 17   Date Filed: 11/03/2015
Case 3:08-cv-00388-M Document 768 Filed 11/03/15   Page 18 of 19   PageID 48320

No. 14-10574

the decision was within its discretion. It offered no other justification, but it did cite two district-court decisions that had denied prejudgment interest in RICO cases. The reasoning in both was that RICO's treble damages sufficiently offset the cost of being temporarily deprived of the recovered funds, making prejudgment interest unnecessary to mitigate the cost of that deprivation. *See La. Power & Light Co. v. United Gas Pipe Line Co.*, 642 F. Supp. 781, 811 (E.D. La. 1986); *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 2011 WL 767163, at *3 n.3 (S.D. Tex. Feb 25, 2011). It is safe to say that the district court denied prejudgment interest for the same reason.

We have "a strong presumption in favor of awarding pre-judgment interest." *United States v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001). "Courts should award prejudgment interest whenever a certain sum is involved." *Thomas v. Tex. Dep't of Crim. Justice*, 297 F.3d 361, 372 (5th Cir. 2002). But even where prejudgment interest is indisputably available, "the decision to award such interest rests within the sound discretion of the district court," and we "will not overturn the district court's determination in the absence of an abuse of discretion." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1140 (5th Cir. 1988).

The court did not abuse its discretion in denying prejudgment interest. It could reasonably have concluded that Allstate's recovery of treble damages sufficiently offset the loss it suffered from being deprived of the use of its money caused by the fraud. Treble damages under RICO are partly punitive, allowing recovery to "exceed actual provable damages." *Gil Ramirez Grp., L.L.C. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 412–13 (5th Cir. 2015). Allstate has already been made more than whole on the damages it could prove, and it has not shown that the prejudgment interest would exceed that extra recovery. We agree with the Second Circuit that a district court does not necessarily abuse

its discretion in relying on the extracompensatory nature of RICO treble damages in denying prejudgment interest. *See Abou-Khadra v. Mahshie*, 4 F.3d 1071, 1083–84 (2d Cir. 1993).

AFFIRMED.[4]

---

[4] Because any remaining issues are not necessary to our disposition, we decline to address them.